# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| CHERYL WESTON,<br><br>              Plaintiff,<br><br>vs.<br><br>AETNA LIFE INSURANCE<br>COMPANY,<br><br>              Defendant. | CV 14-100-BLG-SPW-CSO<br><br><br>**FINDINGS AND<br>RECOMMENDATIONS OF<br>UNITED STATES<br>MAGISTRATE JUDGE** |

Plaintiff Cheryl Weston ("Weston") brings this action under the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1001 et seq., seeking benefits to which she claims entitlement under a

long-term disability ("LTD") plan. *Cmplt. (ECF 1) at* 5. Weston alleges

that Defendant Aetna Life Insurance Company ("Aetna") improperly

stopped paying her LTD benefits under the plan that Aetna issued and

insured. *Id. at 1-2, 5.* Aetna maintains that it properly exercised its

discretionary authority under the plan in terminating Weston's

benefits. *Aetna's First Am. Ans. (ECF 21) at 3-5.*

The parties agreed to submit their dispute to the Court via cross-

motions for summary judgment. *Sched. Order (ECF 19)*. The motions, which raise the issue of whether Aetna's claims determination properly discontinued Weston's LTD benefits, are now ripe for review. *See Weston's Summary Judgment Mtn. (ECF 22)* and *Aetna's Summary Judgment Mtn. (ECF 25)*. Having considered the parties' arguments and submissions, together with the Administrative Record ("AR")[1] filed on October 29, 2014 (*ECF 20*), the Court issues the Findings and Recommendations that follow.

## I.    BACKGROUND[2]

The parties agree to the following facts unless otherwise noted.

### A.    Weston's Initial Receipt of LTD Benefits

Weston was employed as a Call Center Agent for Billings Clinic.

---

[1]Aetna has produced the Administrative Record ("AR"), relied upon by Aetna in terminating Plaintiff's LTD benefits. The AR has been Bates stamped AET000001-000315, with copies provided to the Court and all counsel of record. When referring to the AR, the Court will cite to the Bates stamped pages, for example, as "AET000_ _ _."

[2]The Court compiled the background facts from the parties' Statement of Stipulated Facts *(ECF 15)*, Weston's Statement of Undisputed Facts *(ECF 24)*, Aetna's Statement of Undisputed Facts *(ECF 27)*, Weston's Statement of Disputed Facts *(ECF 29)*, Aetna's Statement of Disputed Facts *(ECF 31)*, and the Administrative Record *(ECF 20)*.

Through her employment, she became a participant in the Billings Clinic Long-Term Disability Plan (the "Plan"). Aetna issued and insured the Plan. Aetna also was the fiduciary of the Plan, as defined in Section 3(21) of ERISA, 29 U.S.C. § 1002(21), with discretionary authority to determine eligibility for benefits and to construe the terms of the Plan. Aetna also is the Claims Administrator for the Plan, which is a welfare benefit plan as defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

After experiencing chronic neck pain, Weston stopped working on May 14, 2006. Three months later, on August 15, 2006 – that is, after the LTD Plan's three-month elimination period[3] – Weston became eligible for LTD benefits and began receiving them on or about that date.

The Plan defines the test for disability for LTD benefit eligibility for employees as follows:

> From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:

---

[3]AET000287.

you are not able to perform the **material duties**
of your **own occupation** solely because of:
disease or **injury**; and

your work earnings are 80% or less of your
**adjusted predisability earnings**.

After the first 24 months that any Monthly Benefit is
payable during a period of disability, you will be deemed to
be disabled on any day if you are not able to work at any
**reasonable occupation** solely because of:

disease; or

**injury**.

If your **own occupation** requires a professional or
occupational license or certification of any kind, you will not
be deemed to be disabled solely because of the loss of that
license or certification.

AET000296 (emphasis in original).

The Plan also provides that LTD benefits may be discontinued for

certain reasons, and defines "Period of Disability" as follows:

A period of disability starts on the first day you are disabled
as a direct result of a significant change in your physical or
mental condition occurring while you are insured under this
Plan. You must be under the regular care of a **physician**.
(You will not be deemed to be under the regular care of a
**physician** more than 31 days before the date he or she has
seen and treated you in person for the disease or **injury**
that caused the disability.)

Your period of disability ends on the first to occur of:

> The date Aetna finds you are no longer disabled or the date you fail to furnish proof that you are disabled.

> The date Aetna finds that you have withheld information which indicates you are performing, or are capable of performing, the duties of a **reasonable occupation** . . . .

. . .

> The date you refuse to receive treatment recommended by your attending **physician** that in Aetna's opinion would: cure; correct; or limit your disability.

AET000298 (emphasis in original).

Weston began receiving disability benefits in August of 2006. Under the foregoing terms, she was required by August of 2008 to satisfy the disability definition to keep receiving benefits.

### B. Aetna's Initial Review of Status of Weston's Receipt of LTD Benefits

In the Fall of 2012, Aetna began reviewing the status of Weston's claim for LTD benefits. Beginning in October 2012, Aetna requested medical records from Weston's treatment providers beginning in the Spring of 2012 to begin an evaluation of her ongoing medical condition.

Aetna's review report noted that Weston had stopped working because of neck and back pain, but that she had undergone cervical spine surgery, discectomy, and fusion for C4-5, 5-6, and 6-7 on July 16, 2009. AET000013. The review noted that Weston experienced seizure-like episodes beginning in 2009. And, the review noted that Dr. Quenemoen prepared a form on March 5, 2012, that:

> noted diagnosis of nonepileptic seizures, cervical strain, and lumbar strain. Form reflects that she is capable of sedentary and light work with [restrictions and limitations] of weight limit. She is capable of 8 hours a day of work five days a week. Expected [return to work] now. [O]bjective findings noted were normal [brain] MRI, normal EEG, abnormal cervical spine from C5-T1 and severe spinal stenosis C4-5 and L4-5. CLW reflects that [employee] can occasionally lift up to 35 pounds, occasionally perform all activities except climb and crawl. She can frequently sit, stand, walk and use hands for all activities and occasionally stoop. She can work 8 hours a day.

AET000014.

### C. Summary of Weston's Medical Records

Respecting her back and neck pain, even though Weston underwent cervical discectomy and fusion surgery in 2009, she reportedly continued to experience chronic cervical and lumbar pain. And, she had findings of stenosis at the level above her fusion.

AET000220.

In an evaluation in April 2012, however, Dr. Michael Schabacker,
M.D., a pain treatment physician, concluded that Weston had diffuse
myofascial pain consistent with fibromyalgia, but saw no evidence of
radiculopathy or myelopathy resulting from her cervical or lumbar
problems. He noted that Weston's condition was relatively stable and
she reported to him that she was "getting along really quite nicely with
regards to her overall health[,]" but she did complain about neck pain
and trouble with pseudoseizures. On physical examination, Dr.
Schabacker found Weston to have normal thoracic kyphosis, lumbar
lordosis, no apparent cranial nerve deficits, and that "she is able to go
from a seated to a standing position without great difficulty."
Respecting the episodes of nonepileptic seizures, he recommended
referring Weston for a psychological or psychiatric evaluation and
treatment, but Weston questioned what that implied.

One year later, in April 2013, Dr. Schabacker noted that Weston
was still having cervical pain along with low back and diffuse
myofascial pain. Weston claimed that opiate medications helped the

pain, and that her pain increased substantially when she tried to go off

the pain medication.  On physical examination, however, Dr.

Schabacker found that Weston was overall doing well, noting:

> Thoracic spine shows normal thoracic kyphosis.  Lumbar
> spine – normal lumbar lordosis.  Seated straight leg raise
> does not increase low-back or leg pain.  Internal and
> external rotation of her hips does not elicit complaints of
> pain.  She is alert and talkative.  Appropriate responses to
> all questions.  Follows commands consistently.  Strength
> testing, including extensor hallucis longus, tibialis anterior,
> triceps surae, quadriceps femoris, iliopsoas, and hamstrings
> shows 5/5 strength.  She is able to go from a seated to a
> standing position without difficulty.  Gait is for the most
> part unremarkable.  No apparent cranial nerve deficits.  No
> sensory deficits.

AET000215-16.

Despite this April 2013 note, only six months later, Dr.

Schabacker stated in a letter dated October 18, 2013, as follows:

> To Whom It May Concern:
>
> Ms. Weston has been a patient in my clinic for several
> years.  She has multiple complex medical problems.
> Because of these medical problems, Ms. Weston is unable to
> work.
> I hope in some way the contents of this letter is [*sic*]
> helpful.  If additional information is needed, I would be
> happy to provide the same given the request is accompanied
> by an appropriately executed Release of Medical Information
> Form.

AET000201.

As noted, Weston also began experiencing seizure-like episodes in 2009 and claims in this action that her chronic pain and seizure-like episodes render her completely disabled. *Cmplt. (ECF 1) at ¶ 5.* Dr. Lowell Quenemoen, a neurologist, evaluated Weston multiple times for her complaints of seizures, which were reportedly worse with stress, pain, and bright lights. He described the episodes as nonepileptic seizures or pseudoseizures. He also noted that she has had multiple normal EEGs and that she reports that she "typically will have some sort of provoking factor of touch, startle, and then passes out." AET000209.

Dr. Quenemoen, on multiple occasions, opined that anxiety was playing a significant role in Weston's complaints, and recommended several times that Weston see a psychiatrist to determine any underlying stress or depression issues. He also noted on January 17, 2013, that Weston had appointments to see a psychiatrist in the past, but did not follow through. AET000209-10.

The seizure-like episodes, which are described throughout

Weston's medical records, were further described by Dr. John Lossing, M.D., who noted in August of 2012 that they "are typified by blank staring, vibratory or oscillatory movements, with 'slumping down.'" AET000255. He also noted that Weston's records include normal EEGs on three occasions, "including one EEG over at St. Vincent Healthcare where 3 different spells of this type were caught on video, without associated electroencephalographic changes." *Id*. He also noted that Weston had a normal MRI scan in 2011. Dr. Lossing concluded as follows:

> I am not going to start out assuming that these spells are actually pseudoseizures. Everybody else has reached that conclusion. The spells are pretty stereotyped, and the key to the case may be the fact that the father has epilepsy too. I am inclined to think that the patient may represent a case of familial mesial temporal lobe epilepsy (FMTLE). This is an interesting and quite rare syndrome of mesial temporal lobe epilepsy with prominent spells that are usually mistaken as pseudoseizures. Because the seizure focus is mesial temporal lobe, the cortical/scalp EEG is usually normal. These patients are hard to diagnose electroencephalographically and sometimes need depth electrodes. The key is the inheritance. It just happens that this patient has a small kindred and only 2 cases do not give us much of a support for an autosomal dominant epileptic syndrome. . . .
>
> My plan is to guess that the patient does have this disorder.

I can only find 16 articles in PubMed on familial mesial temporal lobe epilepsy. It is quite rare. Of these 16 articles, not a single one references any guidance for medical management. There have been a couple of cases of temporal lobectomy attempted for the disorder. . . .

I am going to treat the patient with a sodium channel blocker, carbamazepine, and see if that gives the patient some relief. If the spells became more frequent, that actually would support the idea that these spells are more of a primary generalized autosomal dominant genetic disorder.

. . .

I generally do plan to do a therapeutic trial in this case and if the patient has the spells stop by either a sodium channel blocker, or by another class of drugs such as sodium valproate, then we will assume, retroactively, that the patient really had a variform of epilepsy. I think that makes more sense than assuming automatically that these are pseudoseizures.

AET000257 (emphasis omitted).

About two months later, on October 16, 2012, Weston was treated by Dr. Sheetal Wagle, M.D. Dr. Wagle noted that Weston had been taking carbamazepine since August 2012 and that she "reports that the frequency and severity of the spells are reduced since beginning the carbamazepine treatment." AET000205. He also observed during Weston's visit that she had two spells while in his office that occurred

back-to-back and lasted for about 15 seconds. He noted that Weston
was sitting in a chair,

> appeared to roll her eyes back, and throw her neck back
> with hyperventilation and flailing of arms on the sides. The
> patient did not lose muscle tone or did not slump down in
> the chair. The patient was noted to be oriented immediately
> after the spells. The 2nd episode happened within a minute
> of the 1st episode; and during these 2 spells, the patient was
> fully oriented to self and the surroundings. She was able to
> answer questions without any difficulty.

*Id.*

Aetna's clinical consultant review of Weston's medical records
provided in its review report, in part, as follows:

> [Employee stopped working due to neck pain and had a
> cervical fusion. Primary diagnosis which took [employee out
> of work] appears to have been cervical radiculopathy. What
> is keeping her [out of work] is not clear but she is being
> treated for various pain complaints, myalgias without clear
> diagnoses. She continues to have several various complaints
> and one provider wrote that she is histrionic and theatrical.
> She is on several narcotic pain medications with minimal
> physical findings on exam and her pain specialist noted
> possible fibromyalgia although the normal indicators were
> not documented. She reports spells which have been
> witnessed by doctors and do not appear to reflect normal
> seizures and her EEGs even during these spells have been
> normal. Her most recent neurologist believes they may be
> mesial temporal lobe epilepsy but has not confirmed this.
> The only provider we have who completed disability forms
> notes that [employee] is capable of sedentary or light full

time work. Based on her multilevel cervical fusions these [restrictions and limitations] would be ongoing and supported. Due to her questionable seizures [restrictions and limitations] precluding driving, working around machinery, at heights or in other risky situations are supported and will likely be ongoing. These would not normally preclude the performance of sedentary to light work activities.

AET000016.

### D. Aetna's Evaluation of Weston for Vocational Rehabilitation

On December 3, 2012, Aetna performed a vocational assessment for Weston. Her job readiness statement indicated that she felt she was unable to work, and that she received SSDI for a permanent disability. Weston complained of chronic neck pain, migraines, and daily seizures, and stated that she had memory problems. She said that looking overhead, twisting, turning her neck, lifting anything over 10 pounds, or sitting too long gives her migraines and seizures. She also said that she gets stressed out easily because people are not patient with her. Weston disputed her physician's statement indicating that she could work, and she said that her physician "probably filled out the forms thinking of another patient." AET000021-25.

On December 5, 2012, an Aetna representative spoke with Weston about mandatory vocational rehabilitation and indicated that her physician said that Weston could perform light duty. Weston stated that she would work with vocational rehabilitation, but that no one would hire her.

On January 8, 2013, Weston called Aetna after receiving the letter explaining the mandatory rehabilitation services. Weston said that she could not imagine holding down a job until her seizures were under control, and that it was "laughable" that she could perform sedentary to light duty work full-time. AET000108, 000118.

On January 31, 2013, Aetna closed the rehabilitation investigation, noting that its representatives had "thoroughly documented the efforts to engage the [employee] in [vocational services,]" but that the employee "consistently expressed that she disagrees with the work functionality." AET000027.

In January, April, May, and August of 2013, Aetna representatives spoke with Weston through telephone interviews. Weston continued to reiterate that she could not return to work or

vocational rehabilitation. She reported continued back pain, trouble sleeping, and uncontrolled seizures. And, contrary to her medical providers' examinations, Weston claimed that the pain kept her from sitting, walking, or standing very long, and that she had to change position every 5 to 10 minutes, and she could not read or even watch a movie. AET000032-35, 000039-40, 000042-52.

### E.    Aetna's Evaluation of Weston's Medical Records

In August of 2013, Aetna evaluated Weston's medical records and determined that an EEG did not confirm Weston's seizures, even though she allegedly experienced a seizure while the EEG was occurring. During another interview in August 2013, Aetna concluded that there were no restrictions or limitations that would preclude full-time work, and the information did not support an inability to perform prolonged sitting or standing and lifting up to around 30 pounds. Aetna also concluded that there was no need to contact Weston's medical providers because there were no restrictions or limitations from either Dr. Schabacker or Dr. Quenemoen to support continued disability. AET000055-65.

On August 28, 2013, Aetna performed a rehabilitation own-occupation comparison.  Aetna noted that the information did not support Weston's claimed inability to perform prolonged sitting or standing.  Aetna concluded that Weston could perform sedentary duties of a call center agent (her own occupation), which includes answering calls, routing calls, taking messages, and dispatching the appropriate level of response, with the reasonable accommodation of a sit-stand work stand.  AET000066-68.

## F. <u>Aetna's Decision to Discontinue Weston's LTD Benefits</u>

In a letter dated September 19, 2013, Aetna notified Weston that her claim for LTD benefits had been denied.  The letter provided the Plan language regarding the Test of Disability, and concluded that, based on a consideration of medical records from Dr. Quenemoen and Dr. Schabacker, Weston did not meet the definition of disability as of September 30, 2013.  Aetna noted that Weston had cervical fusion, but there was no information to support a finding that she suffered from complications as a result of this procedure.  Aetna also found that Weston had not been prescribed any medication or treatment for her

pseudoseizures, and that Weston had not sought out psychiatric care despite her doctor's repeated recommendations. Weston's physical examination confirmed that she had full strength and sensation, and there was no evidence to support a finding that she was precluded from working at her own or any reasonable occupation. Aetna did note that Weston had been approved for Social Security Disability ("SSD") benefits, but stated that Aetna's disability determination and the SSD determination are made independently and may be different because the SSD determination is driven by Social Security Administration regulations, or because Aetna reviewed different medical records. Aetna notified Weston that if she disagreed with the determination, she could appeal the decision and could submit additional medical information from all of the physicians who treated her for the conditions in question. The letter concluded by stating that she could also bring a civil claim under section 502(a) of ERISA. AET000154-56. Aetna also called Weston on September 19, 2013, to inform her of the claim denial. AET000073.

## G. Weston's Appeal of Aetna's Decision

In a letter dated October 4, 2013, Weston submitted an appeal letter challenging Aetna's termination of her LTD benefits. She indicated that her condition had not improved, and that it would not improve. Weston also stated that her seizure disorder, her progressive deterioration of her cervical spine, and "other issues" precluded any possibility of future employment, and that her doctors concurred with her assessment. AET000202-03.

In a letter dated October 8, 2013, Aetna acknowledged that it received a copy of Weston's appeal request and stated that it would make a decision by November 21, 2013. Aetna requested that Weston complete an authorization for Aetna to request protected health information, as well as a disability appeal request form, and also requested that she submit any additional information to support her appeal as soon as possible. AET000157-62.

On October 10, 2013, Aetna contacted Weston to conduct an initial appeal interview. Weston claimed that she could not return to work in any capacity, because she was unable to sit for extended

periods of time.  AET000077-80.

Although Weston initially indicated that she would be submitting additional medical information, in November 2013 she indicated that she would like Aetna to continue her disability review without the additional medical information.  AET000103.

Shortly after that communication, she submitted a letter from Dr. Schabacker, which Aetna included in its review.  This letter – the October 18, 2013 letter set forth above that states that Weston "is unable to work[,]" did not include any medical records, and was merely a conclusory statement by Dr. Schabacker without any information to support a functional impairment.  AET000084, 000199-201.

On December 3, 2013, Dr. Priya Swamy, a pain management specialist, completed an independent Physician Review.  Dr. Swamy concluded that from October 1, 2013, through November 13, 2013, Weston reported neck and back pain, possible epilepsy, depression, and fibromyalgia.  The medical records, however, did not support a finding that she was impaired from work, and supported that she could perform sedentary and light duty work no more than eight hours a day.

Dr. Swamy also concluded that there was no evidence of an adverse medication effect, and that there were no restrictions or limitations imposed by Weston's treating physicians. Dr. Swamy found that Weston could perform sedentary or light duty work, and that she could lift 10 pounds frequently, 25 pounds occasionally, could sit or stand for up to 8 hours per day, and could walk up to two hours per day. AET000191-94, 000085-86.

Dr. Swamy was not able to contact Dr. Schabacker by phone for a peer-to-peer review, so the report was sent to him for his review. In a letter dated December 4, 2013, Aetna sent Dr. Schabacker a copy of the peer review performed by Dr. Swamy. Aetna requested that Dr. Schabacker review the document, and that if he disagreed with the conclusions that he respond by December 10, 2013, with information about the areas he disagreed with and any clinical evidence in support of his reasons for disagreement. AET000166. The Administrative Record does not contain any record of a response by Dr. Schabacker to Aetna's December 4, 2013 letter.

In a letter dated December 19, 2013, Aetna upheld its denial of

LTD benefits for Weston. AET000167. Aetna concluded that Weston did not have an impairment that prevented her from performing her own or any occupation based on her medical file and a review by an independent physician who specialized in rehabilitation/pain management. Aetna noted that Weston's medical diagnoses included fibromyalgia, cervical disc disease, facet arthropathy, arthritis, and pseudoseizures, but that she had full muscle strength in her upper and lower extremities, and an MRI of her brain from 2010 was normal. While Dr. Schabacker wrote a statement on October 18, 2013, indicating that Weston suffered from multiple complex conditions that limited her ability to work, he did not provide examination findings, restrictions and limitations, diagnostic reports, or any other information to substantiate an ongoing disability. Aetna detailed the independent medical reviewer's unsuccessful attempts to contact Dr. Schabacker by telephone, and Dr. Schabacker's failure to respond to Aetna's submission of the peer review for his review. The independent physician reviewer concluded that although Weston would have suffered some limitations in October and November 2013, she would

have been able to sustain sedentary to light duty work on a full-time basis given her symptoms and diagnoses.  Aetna concluded that there was insufficient medical evidence to support an ongoing disability from her own or any occupation as of October 1, 2013.  Aetna concluded by stating that this decision was final and not subject to any further review.  AET000167-69.

On August 12, 2014, Weston filed this action.  *ECF 1.*

## II.  LEGAL STANDARDS

### A.  Summary Judgment Standard of Review

Generally, summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  But,

> [t]raditional summary judgment principles have limited application in ERISA cases governed by the abuse of discretion standard.  Where . . . the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is, in most respects, merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.

*Stephan v. Unum Life Ins. Co. of America*, 697 F.3d 917, 923 (9th Cir. 2012) (citations and quotation marks omitted).  And, "judicial review of

benefits determinations is limited to the administrative record – that is, the record upon which the plan administrator relied in making its benefits decision[.]" *Id.* at 930 (internal quotation marks omitted).

An exception to this characteristic of ERISA cases exists in instances in which a court must consider a plan administrator's conflict of interest. *Id.* "[W]hen a court must decide how much weight to give a conflict of interest under the abuse of discretion standard[,] ... the court may consider evidence outside the [administrative] record." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (*en banc*). In considering "evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest[,]" *id.*, traditional rules of summary judgment apply, and "summary judgment may only be granted if after viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact." *Stephan*, 697 F.3d at 930 (internal quotation marks omitted). "[T]he decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Abatie*, 458 F.3d at

970.

**B.    ERISA Standard of Review**

Where an ERISA "plan . . . grant[s] discretionary authority to determine eligibility for benefits, trust principles make a deferential standard of review appropriate." *Stephan v. Unum Life Ins. Co. of America*, 697 F.3d 917, 923 (9th Cir. 2012) (*quoting Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)).

Here, Weston and Aetna stipulate that Aetna has "discretionary authority to determine eligibility for benefits and to construe the terms of the Plan." *ECF 15 at ¶ 4.* And, the LTD Plan unambiguously provides that Aetna has "discretionary authority to: [1] determine whether and to what extent employees and beneficiaries are entitled to benefits; and [2] construe any disputed or doubtful terms of this policy." *AET000284.* Thus, the Court must apply an abuse of discretion standard to Aetna's decision to terminate Weston's LTD benefits.

"Under this deferential standard, a plan administrator's decision 'will not be disturbed if reasonable.'" *Stephan*, 697 F.3d at 929 (*quoting Conkright v. Frommert*, 559 U.S. 506, 521 (2010)). "This

reasonableness standard requires deference to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Id.* (*quoting Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011)). In other words, a court will find an abuse of discretion if it is "'left with a definite and firm conviction that a mistake has been committed,'" and the court "may not merely substitute [its] view for that of the fact finder." *Salomaa*, 642 F.3d at 676 (*quoting United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (*en banc*)).

Also, "the degree of skepticism with which [the Court] regard[s] a plan administrator's decision when determining whether the administrator abused its discretion varies based upon the extent to which the decision appears to have been affected by a conflict of interest." *Stephan*, 697 F.3d at 929. A conflict of interest arises when a plan administrator both determines an employee's eligibility for benefits and pays those benefits out of its own funds – "so by denying benefits, the administrator retains money for itself." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009).

## III.  DISCUSSION

As noted, the parties stipulate that Aetna has "discretionary authority to determine eligibility for benefits and to construe the terms of the Plan." *ECF 15 at ¶ 4.*  Thus, the Court must apply an abuse of discretion standard to Aetna's decision to terminate Weston's LTD benefits.

In applying the abuse of discretion standard, the Court recognizes that Aetna – as Aetna concedes – has a structural conflict of interest because it both evaluates claims and is responsible for paying benefits owed under the LTD Plan.  *Weston Opening Br. (ECF 23) at 10; Aetna Opening Br. (ECF 26) at 10.*  The Court, therefore, first must determine what weight to give Aetna's conflict of interest in the Court's analysis of whether Aetna abused its discretion in determining Weston's eligibility for LTD benefits.  *Stephan*, 697 F.3d at 934.

The Ninth Circuit has provided the following guidance for courts considering whether an administrator abused its discretion while operating under a conflict of interest:

> While not altering the standard of review itself, the existence of a conflict of interest is a factor to be considered

in determining whether a plan administrator has abused its discretion. The weight of this factor depends upon the likelihood that the conflict impacted the administrator's decision making. Where, for example, an insurer has taken active steps to reduce potential bias and to promote accuracy, the conflict may be given minimal weight in reviewing the insurer's benefits decisions. In contrast, where circumstances suggest a higher likelihood that [the conflict] affected the benefits decision, the conflict should prove more important (perhaps of great importance).

*Stephan*, 697 F.3d at 929 (citations and internal quotation marks omitted).

Here, the Court has considered Aetna's conflict of interest as a factor in its analysis of whether Aetna abused its discretion. For the following reasons, the Court does not give significant weight to this factor, and the commensurate level of skepticism affecting the Court's review of Aetna's decision is minimal.

First, there is no evidence, apart from the conflict of interest itself, that the conflict improperly influenced Aetna's decision. Weston argues that Aetna has a financial incentive to deny her benefits, but she concedes that there is no evidence in the record that "Aetna's desire to save money motivated its decision." *ECF 23 at 15*. While it is certainly reasonable to conclude that as a business, Aetna has an

interest in maximizing profits, there is no further evidence in this case that this interest influenced its decision to terminate Weston's LTD benefits.

Second, there is no evidence in the record that Aetna has a history of claims administration influenced by bias or conflicts of interest. Weston has neither argued nor presented evidence suggesting such a history. Rather, the record in this case reflects efforts by Aetna to mitigate its conflict of interest by thoroughly reviewing Weston's medical records, repeatedly seeking additional information directly from Weston and her care providers, and fully reconsidering the information and records during the appeal process. *Stephan*, 697 F.3d at 934 (noting that claims administrator was not required to present evidence showing its attempts at claims administration neutrality, but suggesting that courts should consider presence of such evidence as mitigation of conflict of interest).

Third, there is no evidence that Aetna provided Weston with inconsistent reasons for discontinuing her LTD benefits. As noted above, the record is quite clear that Aetna determined, after reviewing

Weston's medical records and her own allegations respecting her alleged limitations, that she would not be precluded from performing sedentary to light work activities on a full-time basis.

And fourth, there is neither evidence nor argument from Weston that Aetna acted with malice in discontinuing her LTD benefits. As the Plan language expressly states, an employee's "period of disability ends on the first to occur of: The date Aetna finds you are no longer disabled or the date you fail to furnish proof that you are disabled." There is no indication in the record that Aetna acted with malice in making either of the listed findings.

For all of these reasons, the Court concludes that there is a small likelihood that Aetna's conflict of interest impacted its decision in this case. Having concluded that the conflict-of-interest factor is of minimal significance, the Court next must evaluate whether Aetna abused its discretion in deciding to discontinue Weston's LTD benefits. For the reasons that follow, the Court concludes that Aetna did not abuse its discretion.

As noted above, under the deferential abuse-of-discretion

standard, "a plan administrator's decision 'will not be disturbed if reasonable.'" *Stephan*, 697 F.3d at 929 (*quoting Conkright v. Frommert*, 559 U.S. 506, 521 (2010)). And, "[t]his reasonableness standard requires deference to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Id.* (*quoting Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011)).

Here, the Court concludes that Aetna's decision was neither illogical nor implausible, and is supported by evidence in the record. As noted above, Weston became disabled in 2006 and began receiving LTD benefits because of neck and back pain. She underwent cervical spine fusion surgery in 2009. She began experiencing seizure-like episodes that year.

In October 2012, Aetna began a clinical consultant review to evaluate Weston's status. The review stated that Weston had stopped working because of neck and back pain, but noted that she had undergone surgery for the cervical pain. And, although she continued

to have seizure-like episodes, her treating neurologist noted in a form dated March 2012 that she was capable of performing full-time sedentary work.

Aetna then analyzed Weston's medical records from various medical care providers. Aetna also had a physician who specializes in pain management review the records. In addition, Aetna requested additional medical records from Weston and her physicians. And, Aetna conducted a vocational assessment for Weston.

As noted above, from this review, analysis, and vocational assessment, Aetna concluded that Weston was no longer eligible for LTD benefits under the Plan's terms. In sum, with the exception of Dr. Quenemoen's assessment that Weston could perform sedentary and light work full-time with certain weight restrictions, no medical source provided any opinion describing limitations or restrictions on Weston's ability to work. Dr. Schabacker's records stated that Weston had myofascial pain consistent with fibromyalgia, but he noted no evidence of radiculopathy or myelopathy, and his physical examinations of Weston revealed largely normal results. Although he opined in one

letter that Weston was unable to work, he provided no examination findings or diagnostic reports to support this opinion, nor did he list any specific restrictions or limitations for Weston or any other information to support any ongoing disability.

Aetna, moreover, had a physician review Weston's records. The principal conclusion was that no physician imposed upon Weston restrictions or limitations that would preclude her from full-time work activities. AET000063. And the vocational assessment, which included multiple attempts by Aetna representatives to engage Weston in vocational services, proved unsuccessful because Weston "consistently expressed that she disagrees with the work functionality[ ]" report from Dr. Quenemoen. AET000027.

From Aetna's thorough review of Weston's continued eligibility for LTD benefits, summarized above, the Court cannot conclude that its decision was illogical, implausible, or not supported by facts in the record. Thus, the Court concludes that Aetna did not abuse its discretion.

Weston, relying on the Ninth Circuit's opinion in *Montour v.*

*Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9ᵗʰ Cir. 2009), argues

that the Court must evaluate four factors, in addition to the conflict-of-

interest factor already discussed above, in determining whether Aetna

abused its discretion in discontinuing her LTD benefits.  *ECF 23 at 15-*

*17.*  As a point of clarification, in *Montour* the Ninth Circuit did not

mandate consideration of the factors, but rather noted:

> Other [potentially relevant] factors that frequently arise in
> the ERISA context include the quality and quantity of the
> medical evidence, whether the plan administrator subjected
> the claimant to an in-person medical evaluation or relied
> instead on a paper review of the claimant's existing medical
> records, whether the administrator provided its independent
> experts "with all of the relevant evidence[,]" and whether
> the administrator considered a contrary SSA disability
> determination, if any.

*Id.* (footnote and citation omitted)

Weston argues that each factor weighs against Aetna in

evaluating whether it abused its discretion.  But even considering the

foregoing factors, the Court is not persuaded to alter its conclusion that

Aetna properly acted within its discretion in discontinuing Weston's

LTD benefits.

First, respecting the quantity and quality of the medical evidence,

Weston argues that "Aetna's efforts in obtaining an accurate picture of [her] current prognosis and her ongoing ability to work were subpar." *ECF 23 at 15.* Weston argues that the record is replete with evidence of her multiple medical issues and problems. *Id.* But as already noted, the record reflects that Aetna reviewed Weston's medical records, had a physician review her records, sought additional information from Weston and from her medical care providers, and conducted a vocational assessment. Her medical conditions are well-documented and Aetna expressly considered them in making its decision. What the records lack, and what Weston and her physicians repeatedly failed to supply, is evidence of restrictions and limitations stemming from Weston's medical conditions, that prevent her from working. Without such evidence, it cannot reasonably be argued that Aetna abused its discretion in determining that she is not eligible for continued LTD benefits.

Second, respecting Aetna's failure to conduct an in-person medical evaluation of Weston relying instead on a paper review of her existing medical records, the Court concludes that this failure alone is

insufficient to establish an abuse of Aetna's discretion. As noted, there is a lack of objective medical evidence from any of Weston's medical care providers to support a finding that any limitations or restrictions preclude her from sedentary to light full-time work. Instead, Weston relies only on her self-assessment of her limitations in claiming disability. It is clear from Weston's rather extensive medical records that her conditions are well-documented. But evidence that they limit her functionality to the point where she is incapable of working is lacking. In light of the medical evidence of record, it was not unreasonable for Aetna to forego an in-person medical evaluation of Weston and the failure to conduct one was not an abuse of Aetna's discretion under the circumstances.

Third, respecting whether Aetna provided its independent expert with all of the relevant evidence, Weston concedes that it appears that Aetna provided its expert physician with the entire record. *ECF 23 at 16*. But Weston notes that the expert physician "never spoke to Dr. Schabacker and never inquired as to Dr. Schabacker's statement that [Weston] was unable to work." *Id*. The problem with this argument is

that it ignores both Aetna's attempts to get from Dr. Schabacker additional information respecting his conclusory statement that Weston is unable to work and Aetna's expert physician's repeated attempts to engage in a peer-to-peer consultation with Dr. Schabacker and to get further information from him. Thus, this factor does not support Weston's position that Aetna abused its discretion.

Finally, respecting whether Aetna considered SSA's disability determination, Weston concedes that Aetna acknowledged her receipt of SSDI, but argues that Aetna failed to take this into consideration in terminating her LTD benefits. ECF 23 at 17. This is not entirely true. In Aetna's September 19, 2013 letter to Weston advising her that it was discontinuing her LTD benefits after concluding that possesses the ability to work, Aetna explained:

> We understand that you have been approved for Social Security Disability (SSD) benefits. However, our disability determination and the SSD determination are made independently and are not always the same. The difference between our determination and the SSD determination may be driven by the Social Security Administration (SSA) regulations. For example, SSA regulations require that certain disease/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to SSD benefits. Or, it

may be driven by the fact that we have information that is different from what SSA considered. We have not been provided with the basis for the SSD determination, and the evidence that was relied on for the SSD determination has not been identified to us. Therefore, even though you are receiving SSD benefits, we are unable to give it significant weight in our determination, and we find that you are not eligible for ongoing LTD benefits based on the plan definitions as stated above.

AET000155.

As Aetna acknowledged, it knew Weston was receiving SSDI benefits, but did not have before it the basis for that determination nor did it have the evidence supporting that determination. Weston, however, had the opportunity to provide Aetna with that information, if she believed it was pertinent to Aetna's evaluation of her status, when she appealed Aetna's determination. She did not provide it.

Also, the record reflects that Weston began receiving SSDI benefits in 2006, several years before Aetna reevaluated whether she should continue to receive LTD benefits. AET000126. At that time, as noted, Weston was not working, and became eligible for LTD benefits, because of neck and back pain. In the interim years, she underwent cervical fusion surgery to alleviate her pain. There is no evidence in

the record that the Social Security Administration has conducted a recent review, or any subsequent review, of its determination that Weston was eligible for SSDI benefits.  Because the determination was made several years ago, and because it appears that Weston's medical conditions have changed over time, the SSDI benefits determination is less probative of her condition now.  In any event, the Court cannot say that Aetna abused its discretion in making its determination in this case because it did not consider the SSA's determination of Weston's disability from 2006.

For all of the foregoing reasons, the Court concludes that Aetna did not abuse its discretion.

## IV.    <u>CONCLUSION</u>

Based on the foregoing, IT IS RECOMMENDED that Weston's summary judgment motion (*ECF 22*) be DENIED, Aetna's summary judgment motion (*ECF 25*) be GRANTED, and that Aetna's decision discontinuing Weston's LTD benefits be AFFIRMED.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States

Magistrate Judge upon the parties. The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court, and copies served on opposing counsel, within fourteen (14) days after entry hereof, or objection is waived.

DATED this 20th day of July, 2015.

/s/ Carolyn S. Ostby
United States Magistrate Judge